Rev. 2/28/2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-60033-Cr-COOKE(s)

UNITED STATES OF AMERICA

v.

MICHAEL PLESAK,

    Defendant.
_____/

FILED by KAL D.C.

MAR 05 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

## STIPULATED FACTUAL BASIS

MICHAEL PLESAK ("PLESAK" or "defendant") individually and by and through his counsel, Thomas D. Sclafani, and the United States, by and through the undersigned Assistant United States Attorneys, agree and stipulate that the government would produce evidence of the facts recited below which are a fair and accurate summary of the events and the defendant's involvement in the conduct charged in the underlying Information to which the defendant is pleading guilty.

    1. Between in or about October 2008 and February 23, 2012, co-defendant, Vincent Colangelo ("Colangelo"), and others owned and operated at least six (6) pain management clinics and a pharmacy in Broward and Miami-Dade Counties in Florida, including Atlantic Medical Solutions ("AMS") located at 950 N Federal Hwy in Pompano Beach, Florida 33062; All Pain Management, Inc. ("APM") located at 3300 Griffin Road, Dania Beach, Florida; Seaside Medical Center, Inc. ("SMC"), n/k/a Commercial Medical Group, LLC ("CMG"), located at 299 East Commercial Boulevard, Ft. Lauderdale, Florida; Broward Urgent Care, Inc. ("BUC"), located at 1409 S.E. 1st Avenue, Fort Lauderdale, Florida; Friendly Urgent Care, Inc. ("FUC"), located at 3121 W. Hallandale Beach Boulevard, Suite 101, Pembroke, Florida; VIP Pain Center, Inc.

Exhibit - A

("VIPPC"), located at 13936 N.W. 7th Avenue, Miami, Florida; and Friendly Pharmacy, Inc., located at 1623 S. Andrews Avenue, Fort Lauderdale, Florida 33316.

2. PLESAK is the nephew of Colangelo. Neither defendant or Colangelo have any formal medical training or experience. PLESAK had some training as a computer technician and in or around the beginning of 2010, at the age of 25 years, was recruited by Colangelo to program and maintain computers at CMG and paid $600 per week.[1] It was during this period of time that defendant started to become familiar with the operations and ongoing activities of CMG and the pain clinic business. PLESAK became aware that his uncle "Vinny" (Colangelo) made substantial amounts of money approaching $100,000 cash per day from the money generated at CMG and the other pain clinics owned by Colangelo.[2] At first, Colangelo tasked PLESAK with searching the Internet for the sale of high-end luxury and collector vehicles that Colangelo purchased with the proceeds from his pain clinics. PLESAK utilized email accounts VENOMVINNY@GMAIL.COM, VENOMVINCENT@GMAIL.COM which were acquired by Colangelo, as well as his own email account, M37R01D@GMAIL.COM. PLESAK personally assisted Colangelo in identifying and acquiring dozens of these expensive vehicles. In addition, PLESAK deposited and assisted in the transfer of money to and from bank accounts to facilitate the purchase of Colangelo's expensive vehicles. PLESAK was listed by Colangelo as a corporate officer on additional companies all related to the acquisition and disposition of assets

---

[1] Plesak received a pay increase to $900 per week in the last three months of his employment at CMG.

[2] Plesak observed money tallied at the end of each day which included not only the proceeds from CMG, but also the cash proceeds delivered from BUC, APM, FUC and VIPPC.

acquired with proceeds from Colangelo's pain clinics.[3]

3. In approximately April of 2010, defendant assumed an expanded role at CMG and along with being Colangelo's confidant and sidekick, became more involved in the supervision of CMG's staff. PLESAK knew that the clinic only accepted cash and refused to accept medical insurance, checks or credit cards for payment. He also knew that patients were required to pay $200 to $250 for first-time visits and $150 to $200 for follow-up visits. The pain clinics served an average of 100 patients per day who often waited many hours to see a doctor to obtain their prescriptions for narcotic pain medications. PLESAK promoted and observed other clinic employees collect additional money called "VIP" from patients in order to accelerate their appointments with the doctor ahead of other patients. VIP collected by CMG employees averaged $7,000 per day which would be given to Colangelo at the end of each day. PLESAK knew that individuals seeking pain medication at Colangelo's pain clinics needed only a magnetic resonance image ("MRI"), generally of their lower back or neck, take a urine test and claim to have pain, in order to justify prescriptions for large amounts of oxycodone and Xanax

---

[3] On April 15, 2010, PLESAK was listed as Vice-President, Secretary and Treasurer for Vinny's Extreme Machines, Inc., which involved the storage and repair of luxury and exotic vehicles purchased by Colangelo and maintained at a warehouse on Tigertail Boulevard in Dania Beach, Florida as well as the storage and repair of other vehicles; On December 30, 2010, PLESAK was listed as President, Treasurer and Secretary of Plesak Management Services, Inc., which involved the management of websites dedicated to the buying and selling of used cars and automobile body work, but never did any business because of federal seizures taken place on 2/23/2012; On February 9, 2011, PLESAK was listed as Treasurer for VC and LG Investments, Inc., a real estate investment company involving the buying and selling of duplexes (Plesak stated that he was unaware of his listed position in that cooperation and never became actively involved); On February 15, 2011, PLESAK was listed as President of Plesak Marketing, Inc., which was intended to be in collaboration with K.G. (The purchaser of CMG) and involved the online marketing through Google AdWords©, but never became active because of the federal seizures on 2/23/2012.

(alprazolam).[4] Initially, triage was performed by non-medically trained personnel who were responsible for testing patient urine samples for the presence of illicit drugs and determine whether patients were actually taking oxycodone as allegedly prescribed.[5] Some of the triage technicians hired during the later part of the conspiracy had CPR certification. PLESAK knew that triage technicians at the pain clinics often falsified the urine test results in exchange for bribes of $50 to $100 in order to attempt to justify the prescription of excessive pain medication by the clinic doctors. PLESAK was aware that many of the clinic patients were sponsored by drug dealers. The sponsors[6] paid for the sponsored patients' MRIs, clinic visits and for the prescriptions filled. The sponsored patients usually gave all or a large portion of their 30 mg. oxycodone pills to their sponsors and received in exchange either money and/or a portion of the drugs (usually the 15 mg. oxycodone pills and 2 mg. Xanax tablets). PLESAK estimated that approximately 90% of patients at CMG were "doctor shoppers"[7] and/or drug addicts and drug

---

[4] Alpralozam is the generic name for the Schedule IV prescription drug commonly known as "Xanax," the patent name brand.

[5] The presence of illicit drugs in the patient's urine would alert the examining physician of the possibility of patient drug abuse and the very dangerous possibility of combining illicit drugs with prescription pain medication. The absence of oxycodone and/or Xanax in the patient's urine would signify the likelihood that the patient was "opioid" naive and/or "benzo" naive and was diverting his/her prescriptions. Moreover, if "opioid"or "benzo" naive, the patient would be intolerant of large amounts of oxycodone and/or Xanax and would be at high risk for overdose.

[6] "Sponsoring" is a term used by law enforcement and in the medical community, particularly in the pain management medical community, to refer to the act of recruiting ne'er-do-wells, drug addicts and/or dealers as well as individuals wanting to earn some quick money to schedule appointments at nefarious pain clinics ("pill mills") to obtain prescriptions of highly addictive prescription pain medications. In exchange for paying the costs related to obtaining prescription drugs, the "sponsor" is given most or all of the prescription drugs and the "patient" is either paid a fee or given a portion of the drugs prescribed.

[7] "Doctor shopper" is a term used by law enforcement and in the medical community, particularly, the pain management medical community, to refer to an individual who seeks multiple prescriptions from different doctors within a 28-day period or within the period of time intended by

dealers. PLESAK surmised that a very small percentage of clinic patients actually suffered from significant pain. The vast majority of clinic patients were in their 20's.

4. PLESAK knew that Colangelo had an arrangement with F.M.I. to send patients to F.M.I. to obtain MRI reports. In exchange, the owners of F.M.I. "guaranteed" that the MRIs for patients of Colangelo's clinic would "show something wrong" so that clinic doctors could attempt to justify prescribing maximum amounts of pain medication to the clinic patients. PLESAK was aware that the agreement between Colangelo and F.M.I. included a kickback of a portion of the monies paid for the MRI report to Colangelo and that Colangelo directed thousands of patients to F.M.I. to get their MRIs. PLESAK knew that P.T. was the owner of F.M.I. and that Colangelo had known P.T. for a long time since P.T. previously worked for Colangelo's father. PLESAK overheard Colangelo threaten to stop referring his patients to F.M.I. when several of the MRI reports received at CMG indicated that there was nothing wrong with the patients tested. At a meeting attended by PLESAK at CMG, P.T. promised Colangelo that he would rectify the situation and Colangelo resumed referring clinic patients to F.M.I. After that meeting, PLESAK did not observe any more F.M.I. MRI reports that cleared the clinic patients of any alleged medical anomaly.

5. PLESAK was aware that Colangelo called and directed to others to call prospective patients from a list of telephone numbers obtained by Colangelo from Internet inquiries made by individuals who were seeking pain medication. These individuals were drawn to CMG by Internet and local newspaper advertising paid for by Colangelo. Many of these individuals

---

the prior issued prescription. It is more loosely referred to individuals who "shop" from one medical clinic to another seeking prescriptions of highly addictive prescription pain medications to feed their addiction, divert the prescription drugs, or both, without a legitimate medical purpose for such drugs.

resided long distances from CMG. They were encouraged to schedule appointments at CMG by promising them that the clinic doctors typically prescribed "240/90/90."[8]

6. A federal grand jury subpoena was served upon Network Solutions in November 2010 "seeking all domain names and their registration and billing information registered to Vincent Colangelo or Vinny Colangelo or Commercial Medical Group . . . and any such information that is registered to the email addresses of VENOMVINNY@GMAIL.COM or VENOMVINCENT@GMAIL.COM."[9] In a verified Affidavit filed by the custodian of records for Network Solutions dated November 11, 2010, the company indicated that over 1,500 domain names were registered to Vincent Colangelo from October 2009 to May 7, 2010, under account #31934661 through the VENOMVINNY@GMAIL.COM email account. Colangelo was listed as the "Primary Holder" of the account and a "Platinum VIP" member.[10] All but one of the 1,500 domain names were associated with the "pain clinic" industry. PLESAK was identified as the "administrator" of the account with an email address of "M37R01D@GMAIL.COM" and a user identification of "commercialclinic." It was through the strategic Internet orchestration of these 1,500 domain names and the follow-up phone calls that Colangelo managed to identify, solicit, and direct hundreds of prospective patients to CMG.

---

[8] Colangelo verbally demanded that his doctors prescribe a cocktail commonly referred to as 240/90/90 which meant 240 - 30 mg. oxycodone pills, 90 -15 mg. oxycodone pills and 90 - 2 mg. alprazolam tablets. As law enforcement and negative publicity increased pressure on pain clinics, and pharmacy resistance to fill such excessive prescriptions, Colangelo lowered the mandated minimum formula slightly to 210, 200 and 180 oxycodone 30 mg. pills and 30 alprazolam 2 mg. tablets.

[9] Network Solutions, LLC, is a technology company founded in 1979. The domain name registration business has become the most important division of the company. As of January 2009, Network Solutions managed more than 6.6 million domain names. (http://en.Wikapedia.org/wiki/Network_Solutions (Accessed January 26, 2011)).

[10] "Platinum VIP" status entitled the member to be assigned a Dedicated Account Manager.

7. PLESAK participated in the interview and hiring of several doctors employed at Colangelo's clinics. He was aware that prospective pain clinic doctors would only be hired if they agreed to prescribe excessive amounts of oxycodone and Xanax to the clinic patients. PLESAK knew that clinic doctors were paid on a per patient visit basis where they prescribed oxycodone and/or Xanax. The vast majority of the patients at Colangelo's pain clinics received prescriptions for some combination of oxycodone and Xanax. When two doctors worked at the pain clinic at the same time, they often competed for numbers of patients because it directly affected the amount they made. PLESAK was aware that the doctors working at CMG were not only paid a fee per patient visit, but also were offered an additional incentive of $5.00 per patient in which they prescribed at least 200 oxycodone 30 mg. pills. If the clinic doctor failed to prescribe the excessive amounts of pain medication promised, patients frequently complained to Colangelo, Sara Cogdill or PLESAK and the doctor was usually persuaded to accommodate the demands of the complaining patient. PLESAK believed that many of the patients diverted the drugs prescribed to them by the clinic doctors for large profits on the illegal market.[11] During the period of the conspiracy co-conspirators ordered and caused to be ordered over 660,000 dosage units of oxycodone from seven (7) different distributors to be dispensed through five (5) clinics.

8. PLESAK recruited several of his personal friends to work at CMG, including J.H., S.S. and M.C. None of PLESAK's friends had any medical training of experience before working at CMG. During their employment, PLESAK was aware that they were directed by

---

[11] Prescribed 30 mg. oxycodone pills were purchased for approximately $2.00 to $5.00 through pharmacies or at the dispensary at CMG. The same pills sold for anywhere from $10 to $30 per pill on the street.

Colangelo to obtain MRI reports at F.M.I. and schedule appointments to obtain pain medication at CMG despite the fact that none of them had any known medical condition that required pain medication. PLESAK knew that his friends received excessive amounts of oxycodone and Xanax from the doctors at CMG who were aware that they were employees at CMG. Besides employees at CMG, PLESAK was aware of other patients who were employed at Colangelo's other pain clinics or otherwise associated with Colangelo who diverted all or a portion their pain medication they received at CMG to Colangelo who either used the drugs or diverted them to others.

9. A government expert reviewed patient files from CMG and concluded that the prescriptions of excessive quantities of controlled substances, primarily oxycodone, a Schedule II Controlled Substance, and alprazolam, a Schedule IV Controlled Substance, were not for a legitimate medical purpose and not within the standard of care in the course of professional practice of pain management.

10. MICHAEL PLESAK knowingly, intentionally and unlawfully conspired with others to commit the following offenses:

    a. to dispense and distribute, and cause to be dispensed and distributed, quantities of controlled substances, primarily oxycodone, a Schedule II Controlled Substance, not for a legitimate medical purpose and not in the usual course of professional practice; and

    b. On or about the dates specified below the defendant, did knowingly engage and attempt to engage in monetary transactions affecting interstate and foreign commerce, by and through a financial institution, involving criminally derived property of a value greater than $10,000, from violations of controlled substances in violation of Title 21, United States Code, Sections 841(a)(1) and 846:

(1) on or about March 15, 2010, the purchase of a 1970 Ford Mustang, VIN 0505M113329, for $54,000, consisting of a $54,000 deposit to the seller's account at Comerica Bank;

(2) on or about March 21, 2010, the purchase of a 1970 Ford Mustang Mach 1, VIN#0805M135413 for $42,000, consisting of a $40,000 deposit to the seller's account at Bank of America and a $2,000 credit card deposit;

(3) on or about March 30, 2010, the purchase of a 1992 Acura NSX, VIN#JH4NA1159NT001249, for $82,595.00, consisting of a wire transfer of $82,595.00 to the seller's account at Bank of America;

(4) on or about April 23, 2010, the purchase of a 2007 Ford Mustang, 1ZVFT92HX75263254, for $43,000, consisting of a $43,000 deposit to the seller's account at PNC Bank;

(5) on or about April 27, 2010, the purchase of a 2005 Ford Mustang GT Ronaele, VIN#1ZVHT82H755205849, for $22,500, consisting of a $22,500 deposit to the seller's account at Bank of America;

(6) on or about May 5, 2010, the purchase of a 2010 Ford Mustang, VIN#1VBP8CH4A5116596, for $68,000, consisting of four cash deposits to the seller's account at SBC Bank;

(7) on or about May 24, 2010, the purchase of a 1930 Ford Classic Car, VIN# A3443522, for $270,000, consisting of a wire transfer to the seller's account from PLESAK's account at Bank of America;

(8) on or about November 15, 2010, the purchase of a 1969 Chevrolet Camaro, VIN#124379N608240, for $55,000 consisting of a cash deposit to the seller's account

at Bank of America; and

    (9) on or about January 17, 2011, the purchase of a 2010 572 cubic inch supercharged engine for $31,470, consisting of a cash deposit to the seller's account at Bank of America.

 11. The defendant and his attorney acknowledge by their signatures below that they have reviewed the stipulated facts with each other and agree with the accuracy of the facts as recited hereinabove.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 2/29/12

By: _____
SCOTT H. BEHNKE
Assistant United States Attorney

Date: 2/29/12

By: _____
GREGORY E. TORTELLA
Special Attorney, U.S. Dept. Of Justice

Date: 2/29/12

By: _____
THOMAS D. SCLAFANI
Attorney for the Defendant

Date: 2/29/12

By: _____
MICHAEL PLESAK
Defendant